1                    UNITED STATES DISTRICT COURT FOR
                      THE DISTRICT OF MASSACHUSETTS
2

3
                                        )
4  UNITED STATES OF AMERICA,            )
                                        )
5           Plaintiff,                  )
                                        )   Criminal Action
6                                       )   No. 04-10336-NMG
   vs.                                  )
7                                       )
                                        )
8  REYNALDO RIVERA,                     )
                                        )
9           Defendant.                  )
                                        )
10

11
                       TRANSCRIPT OF SENTENCING
12

13
              BEFORE THE HONORABLE NATHANIEL M. GORTON
14              UNITED STATES DISTRICT JUDGE

15

16                United States District Court
                John J. Moakley U.S. Courthouse
17                    1 Courthouse Way
                Boston, Massachusetts  02210
18                     June 22, 2007
                        3:45 p.m.
19

20                     * * * * * *
21

22
                SHELLY M. KILLIAN, RPR, CM, CRR
23                  Official Court Reporter
                John J. Moakley U.S. Courthouse
24              1 Courthouse Way, Room 3510
                    Boston, MA  02210
25                    (617) 737-7117

PDF created with pdfFactory trial version www.pdffactory.com

1  APPEARANCES:

2  For the Plaintiff:

3       William F. Bloomer, AUSA
         United States Attorney's Office
4        John Joseph Moakley Federal Courthouse
         1 Courthouse Way, Suite 9200
5        Boston, Massachusetts  02210

6  For the Defendant:

7       Carl N. Donaldson, Esq.
         Carl Donaldson & Associates
8        240 Commercial Street
         Boston, Massachusetts  02109

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2              (The following proceedings were held in open court

 3    before the Honorable Nathaniel M. Gorton, United States

 4    District Judge, United States District Court, District of

 5    Massachusetts, at the John J. Moakley United States Courthouse,

 6    1 Courthouse Way, Boston, Massachusetts, on June 22, 2007.)

 7              The defendant, Reynaldo Rivera, is present with

 8    counsel.  Assistant U.S. Attorney William Bloomer is present.)

 9              THE CLERK:  All rise.  United States District Court

10    for the District of Massachusetts, Court is now in Session.

11    For sentence, criminal matter 04-10366, United States versus

12    Reynaldo Rivera.

13              Would counsel please identify themselves for the

14    record.

15              MR. BLOOMER:  Good afternoon, your Honor.  William

16    Bloomer for the United States.

17              THE COURT:  Good afternoon, Mr. Bloomer.

18              MR. DONALDSON:  Good afternoon, your Honor.  Carl

19    Donaldson for Mr. Rivera.

20              THE COURT:  Mr. Donaldson, Mr. Rivera.  And we have

21    a court interpreter.  If he would introduce himself, please.

22              INTERPRETER:  Gabriel Haddad.

23              (Gabriel Haddad, Interpreter, sworn)

24              THE COURT:  And we have Miss Rofo, is it, from

25    Probation?
```

```
 1              PROBATION OFFICER:  Yes.

 2              THE COURT:  Please be seated.  We are here on the

 3    sentencing of Mr. Reynaldo Rivera, and I have received and read

 4    the presentence report, the government's sentencing memorandum

 5    and the defendant's memorandum in aid of sentencing.

 6              Is there anything that I haven't mentioned that I

 7    should have received in writing, Mr. Bloomer?

 8              MR. BLOOMER:  Nothing from the government.

 9              THE COURT:  Mr. Donaldson?

10              MR. DONALDSON:  Nothing from the defense, your

11    Honor.

12              THE COURT:  All right.  Then as I understand it, we

13    obviously need to go through this three-prong process, the

14    first of which is to establish the appropriate guideline range

15    and then to consider whether any departures are warranted or

16    any matters under 3553(a) would warrant a variance to a

17    guideline sentence.  I understand there have been a few

18    objections filed by both the government and the defendants to

19    the presentence report.  And basically they all turn on, first,

20    the amount of drugs to be attributed to this defendant,

21    Mr. Rivera, and then his role in the offense, whether or not a

22    three-level increase should be granted or attached on the basis

23    that Mr. Rivera was a manager of a substantial criminal

24    enterprise.

25              As I understand it, the government has informed the
```

PDF created with pdfFactory trial version www.pdffactory.com

1    Court that it believes the amount of drugs that Mr. Rivera

2    should be charged with is the lower amount, that is, between

3    400 and 700 grams of heroin rather than in excess of 700 grams,

4    but that the Court -- the government apparently believes that

5    the amount is so close to 700 that it could go either way.

6              Is that correct?

7              MR. BLOOMER:  That's right, your Honor.  It's right

8    on the cusp of 700 grams.  And where this was a case, as this

9    Court recalls, there were 12 defendants and there was a log jam

10   in that no one had pled guilty and with the exception of a

11   couple of defendants as the trial approached.  And I felt that

12   the weight of the heroin was so close to 700 that perhaps the

13   benefit of the doubt would cut in favor of the defendant under

14   United States v. Sklar.

15             THE COURT:  And which of the particularly

16   attributed amounts of drugs would the government suggest brings

17   it back down to close to the 700 gram level?

18             MR. BLOOMER:  Well --

19             THE COURT:  Because apparently if you add them all

20   up, it's 735.  So you're only 35 grams into that category.

21             MR. BLOOMER:  Only 35 grams into the category.  The

22   one -- I think it was paragraph 90 where it described

23   Mr. Torrado -- a 50-gram pickup that was apparently

24   Mr. Santiago used Mr. Rivera's truck in order to leave some

25   drugs for Mr. Torrado.  There was no indication about, you

PDF created with pdfFactory trial version www.pdffactory.com

| | |
|---|---|
| 1 | know, the defendant knew how much drugs were going to be put |
| 2 | there, what type of drugs or who was going to pick them up.  It |
| 3 | was just can I use the office, meaning the car, and Rivera said |
| 4 | yes.  So it was kind of ambiguous.  If there was one |
| 5 | transaction you could say you can deduct, that would be it. |
| 6 | THE COURT:  All right, thank you. |
| 7 | Mr. Donaldson, do you wish to address that issue? |
| 8 | MR. DONALDSON:  Yes, your Honor.  If it please the |
| 9 | Court. |
| 10 | THE COURT:  Yes, you may. |
| 11 | MR. DONALDSON:  With respect to the 50 grams that |
| 12 | the government has just discussed, it wasn't any drugs, I |
| 13 | believe, that was left in the office.  He said he needed him to |
| 14 | facilitate or that he wanted his friend to meet him -- his |
| 15 | friend being Torrado -- to meet him up on the hill.  I believe |
| 16 | that's the way it was established.  And that he told him that |
| 17 | he had been waiting all day to receive those but that he would |
| 18 | leave some food for, speaking in terms of drugs, that he would |
| 19 | leave some food for him but that never took place.  So that was |
| 20 | the 50 grams. |
| 21 | THE COURT:  That was the one on September 30th? |
| 22 | MR. DONALDSON:  That would be September 30th, |
| 23 | 2004.  I didn't put that in my memorandum because I knew that |
| 24 | the drugs was more than 400, but I knew assuredly that it was |
| 25 | less than 700.  There was at least two or three other issues |

PDF created with pdfFactory trial version www.pdffactory.com

1    that I brought to the Court's attention with respect to 80

2    grams that there was a negotiation between Zuleima Reyes,

3    Mr. Rivera and Detective Chavez, the undercover agent.

4              THE COURT:  That was the February 12th incident?

5              MR. DONALDSON:  Yes.

6              THE COURT:  And they were discussing how much he

7    could purchase the drugs for.  And the three of them agreed

8    upon a price but no drugs were ever purchased.  There was never

9    any meeting when they were going to get together to sell drugs,

10   any of that -- any of those things took place.

11             Also, your Honor, I pointed out on October the

12   15th, 2004 when the officers arrested Zuleima Reyes, they found

13   39.7 grams -- 39.6 grams at her residence.  And she said she

14   was holding those there for Rey.  I would like to take

15   exception to that for two reasons.  If the government -- I

16   mean, if the Court would believe that the 39.7 grams was in

17   fact being held for Rey -- for Mr. Rivera, then that is close

18   enough to the date of the purchase of the other grams of

19   cocaine -- not cocaine, heroin.  Excuse me, your Honor.

20   Because on the -- I believe it was the 14th there was a

21   purchase of 140 --

22             THE COURT:  180.

23             MR. DONALDSON:  Well, there was 180 seized from

24   Mr. Rivera's address.  And I believe that there's a level of

25   double counting there.  For example, there was a -- there was

1    a -- on the 13th there was a purchase of a hundred -- I want to

2    make sure I have it right, your Honor.  I have to go back to my

3    note.  On the 13th there was a purchase for 140 grams.  And

4    then they found another 18 grams at his house on the 10th -- on

5    the 15th of August.

6              THE COURT:  Okay.  But he wasn't attributed that

7    first 140.  At least according to the presentence report, in

8    paragraph 133 he is held accountable only for the 180 that was

9    seized at the residence.

10             MR. DONALDSON:  Right.  And my suggestion is is

11   that if -- but there was -- there was -- on 9/20/2004 there was

12   also a person who bought 120 grams.  My argument is you could

13   look at it both ways.  It could -- that 120 grams could be in

14   the 140 grams.  And the 39 -- that 39.7 grams, if she was

15   holding it for Mr. Rivera, could be part of --

16             THE COURT:  I understand your point.

17             MR. DONALDSON:  Okay.  The other issue is that with

18   respect to this 39.7 grams is cut another way, your Honor,

19   there is discussions on October the 29th -- I'm sorry, January

20   the 29th, 2004 between Detective Chavez and Zuleima Reyes that

21   Mr. Rivera and her were no longer working together and that she

22   was on her own, that he had nothing to do with any more of

23   those sales.  And she was -- and he was to deal directly with

24   her.  And that occurred on the 29th.  On the 30th of January he

25   purchased 30 grams of heroin from Miss Reyes.  They're also

PDF created with pdfFactory trial version www.pdffactory.com

1    attributing that 30 grams to Mr. Rivera as well.  And then

2    gathering those calculations would be the 80 grams, the 30

3    grams, the 39.7 grams, and the 50 grams would come up to

4    approximately 249 grams off the 736 grams, which, again, we're

5    still in between the 400 and 700 range, but we're not over the

6    700 range.

7             THE COURT:  I understand.  I understand your

8    position.  Well, the Court believes that there is enough

9    ambiguity in the attribution of the amount of drugs

10   attributable to Mr. Rivera that the -- under a preponderance of

11   the evidence standard the Court will find that the amount

12   attributed is under 700 grams but just barely.  It seems to me

13   it's very close to 700 grams.  I do not accept all of the

14   claims of Mr. Donaldson on behalf of the defendant, but I do

15   accept the fact that there is enough ambiguity on several of

16   them so that the Court would be best guided by finding the

17   amount of drugs between 400 and 700 grams.  I do for the

18   record, however, note that the Court believes it's much closer

19   to 700 than 400.  And, therefore, I am not accepting the

20   probation department's recommendation.  And that means that

21   under Guideline 2D1.1, which is the appropriate guideline that

22   we're dealing with here, and particularly the 2006 manual which

23   is the one that is recommended that we use, the appropriate

24   base offense level would be 28 rather than the recommended 30.

25             There is now also an objection by the defendant to

PDF created with pdfFactory trial version www.pdffactory.com

1    the attribution of the three-level increase for the role in the

2    offense under 3B1.1(b).  There seems to be ample evidence that

3    the Court is aware of that Mr. Rivera was, in fact, a manager

4    or supervisor and that he supervised one or probably most

5    likely two others who were involved in this very extensive 12

6    or more persons conspiracy to distribute heroin in the Lowell,

7    Massachusetts area.

8            I've read your response to that, Mr. Donaldson, and

9    I'll be glad to hear you if you wish to amplify your argument

10   in that regard.

11           MR. DONALDSON:  Thank you, your Honor.  If it

12   pleases the Court.

13           As your Honor is aware, your Honor has already

14   stated that you find that there's ample, so I'm not going to

15   belabor the point because I don't want to in any way appear

16   that I'm disrespecting the Court.

17           THE COURT:  You're entitled to your opinions,

18   Mr. Donaldson, and you can express them.

19           MR. DONALDSON:  Okay, thank you, your Honor.

20           Number one, there is nothing in the record and with

21   respect to the exhibits that I gave you that showed that there

22   was any other -- any more of a decision-making authority over

23   either one of the two individuals.  That would be Arroyo or --

24           THE COURT:  Reyes.

25           MR. DONALDSON:  Reyes.  And there is nothing in the

1    record that indicated that Mr. Rivera recruited those two

2    individuals, and there's nothing in the record that indicated

3    that he got or received a larger share of the profits with

4    respect to those limited sells.  There's nothing in the record,

5    your Honor, that would indicate he had any degree of control or

6    authority over either one of those two individuals.

7            What you have, your Honor, is -- if I can deal with

8    Mr. Reyes first.  Of the exhibits that I gave your Honor, it

9    indicates by the understanding of Mr. Chavez that Miss Reyes

10   was in fact Mr. Rivera's girl friend.  They were in a

11   boyfriend/girl friend relationship.  And oftentimes, especially

12   in these types of relationship, the business, they were

13   partners, your Honor.  They were partners.  There is no

14   street-level dealer who is going to give a source to a -- give

15   a wholesale source -- give a source to their supplier and cut

16   out their profit in that overall scheme.

17           In other words, what I'm saying is that if I'm the

18   street-level dealer and I'm being supervised or managed by my

19   supplier or my boss, I'm not going to -- because the only way

20   I'm going to make my money is if I go out and sell the drugs,

21   you know, what I get for them, I'm not going to take one of my

22   clients and introduce them to my boss and tell my boss, look,

23   this guy wants to buy large amounts of drug, what kind of price

24   are you going to give him?  And even if that was the case,

25   there is no indication that Mr. Rivera paid her any money or

PDF created with pdfFactory trial version www.pdffactory.com

1   recruited her to do that.

2            There is no indication that Mr. Rivera controlled

3   that whole situation.  It's more that Detective Chavez -- of

4   course that's his job.  He controlled the situation along with

5   Mr. Rivera because she wanted, as a general partner would do

6   with another person you're in business with, is to say, look,

7   how much can we sell these drugs to this person for?  And they

8   calculated what the drugs should be sold for.  And that was

9   consistent.

10           And if you look at some of the other discussions in

11  there with respect to Mr. Rivera and Mr. Santiago, one of the

12  of individuals who went to trial on this case, he asked her

13  about Mr. -- and he specifically asked Mr. Rivera about Miss

14  Reyes, and Mr. Rivera said we're not friends anymore.  And she

15  had indicated that earlier back in February that they weren't

16  together anymore as well.  But they actually had a business

17  relationship and they were partners in that business

18  relationship.

19           It appears based upon the sales, your Honor,

20  that -- and it would appear at first glance that Mr. Rivera was

21  a supervisor/manager over these two individuals or especially

22  Miss Reyes.  But then that would cut against, you know, women

23  who are out here in this business as well.  They're just as

24  smart and just as intelligent.  And it would cut against -- I

25  would -- I would compare that to being a chauvinistic approach

PDF created with pdfFactory trial version www.pdffactory.com

1    to say that every woman who's involved with another person in

2    drug transactions that they, you know, are always going to be

3    the subordinate of the man.  Sometimes there are women who are

4    in these relationships and they are managers and supervisors.

5    But in this particular situation they were co-partners in their

6    endeavor.

7                On the other hand, your Honor, you have the one

8    sell, Mr. Arroyo, back in December of 2003.  Mr. Arroyo in

9    December of 2003, basically he gets -- Detective Chavez makes a

10    telephone call.  He says that it's Mr. Rivera but he doesn't

11    know for a fact that it's Mr. Rivera.  He just assumes that

12    it's Mr. Rivera because he has access to the telephone number.

13    And later on that -- after that Mr. Rivera comes -- not

14    Mr. Rivera, Mr. Arroyo comes and makes the sale.  There's no

15    indication that Mr. Rivera recruited him to make that sale,

16    there's no indication that Mr. Rivera paid him to make that

17    sale, there's no evidence on -- on the -- on the other hand

18    either that he was just doing that as a favor for Mr. Rivera.

19    There's no indication that Mr. Rivera -- that he actually even

20    worked for Mr. Rivera other than any maybe self-serving

21    statements that Arroyo said after he was arrested just to place

22    the blame on someone.

23                But the facts taken into consideration, the total

24    circumstances of this transaction, if he worked for Mr. Rivera,

25    that would not only be the first time that he was able to work

1 for him.  He would have worked on him in other indications.

2 There's no indications after all the phone taps and, you know,

3 the pager taps that there would be some communications between

4 Mr. Arroyo and Mr. Rivera.  There is none.  So it doesn't

5 indicate that he actually recruited him or even that he worked

6 for him or that he even had control over this individual.

7   What Mr. Rivera was was a distributor.  He sold

8 drugs; he bought drugs.  Sometimes if Mr. Santiago needed to

9 have some contact with Mr. Torrado, he'd ask him where

10 Mr. Torrado was but only because Mr. Torrado and Mr. Rivera was

11 friends.  But Mr. Torrado cut his own deal with Mr. Santiago as

12 well.  And that's what we have here.

13   So under these circumstances, your Honor, I would

14 not suggest that by a preponderance of the evidence that

15 Mr. Rivera was a manager.  I would suggest that he was no more

16 than a middle man who was out there trying to make as much

17 money as he could, and he did not under those circumstances

18 have anybody working for him because he was taking the most

19 money for himself.

20   THE COURT:  Thank you, Mr. Donaldson.

21   Mr. Bloomer?

22   MR. BLOOMER:  My wife would be upset if I sought a

23 role enhancement because I was a chauvinist.  I would limit

24 myself to the evidence and that is that the undercover agent

25 negotiated a sale with Mr. Rivera, Mr. Rivera sent Mr. Santiago

PDF created with pdfFactory trial version www.pdffactory.com

1    Arroyo to consummate the sale.  Whenever the undercover agent

2    sought a price reduction or sought a large amount of heroin,

3    Miss Reyes said she had to check with her guy and at one point

4    referred to him as her boss and then reached out to Mr. Reyes.

5    The fact --

6              THE COURT:  You mean Mr. Rivera.

7              MR. Bloomer:  Mr. Rivera.  I'm sorry.  The fact

8    that they had a relationship as well doesn't mean that he can't

9    be her supervisor.  The evidence shows that he supervised Miss

10   Reyes, sent her to consummate the deals, and whatever

11   negotiations went through Miss Reyes had to get Mr. Rivera's

12   permission or authority to either lower the price or to get

13   large amounts of heroin.

14             I just want to clarify one thing.  Mr. Donaldson

15   indicates that Miss Reyes said she was no longer with him or

16   dealing with Mr. Rivera.  The evidence is that when they were

17   negotiating the 80-gram delivery, there was -- there was some

18   negotiation about the price.  Ms. Reyes, the information showed

19   contact with Mr. Rivera; Mr. Rivera then showed contact with

20   Mr. Santiago.  Mr. Santiago then came to Mr. Rivera's house.

21   There was conversation that they were all set for the deal.

22   And because we had had enough information to get a wiretap and

23   we didn't want to spend another X thousands of dollars, we

24   cancelled the sale.  There was an indication in subsequent

25   conversations that Ms. Reyes and Mr. Rivera were very upset

PDF created with pdfFactory trial version www.pdffactory.com

1    that that sale was cancelled and that ultimately it ended with

2    a call we're not doing that anymore.  Click.  That was the call

3    Mr. Donaldson was referring to in February.  After that we went

4    up on wires.

5            So I would suggest clearly by a preponderance of

6    the evidence he's worthy of a role enhancement.

7            THE COURT:  Mr. Donaldson?

8            MR. DONALDSON:  If I may, your Honor.  As

9    Mr. Bloomer indicated that they were upset, it wasn't that

10   Mr. Rivera was just upset.  I'd also like to point your Honor

11   to 3B1.1 comment note 4, which indicates that, you know, terms

12   such as boss or leader, of that nature, terms of that nature

13   are not controlling with respect to these issues as it relates

14   to roles --

15           THE COURT:  They're not controlling but they are

16   evidence, are they not, Mr. Donaldson?

17           MR. DONALDSON:  They are evidence, your Honor.

18   That's why I say in the totality of the circumstances, if we're

19   going to cut it one way or the other, I think a liberal reading

20   of all the evidence would indicate that he was not the manager,

21   that he was no more than a distributor.

22           THE COURT:  Well, the Court respectfully disagrees

23   with defendant's counsel and finds that Mr. Rivera was, in

24   fact, a manager as that term is defined in the Sentencing

25   Guidelines at 3B1.1(b), which instructs the Court that if the

PDF created with pdfFactory trial version www.pdffactory.com

1  defendant was a manager or supervisor but not an organizer or

2  leader and the criminal activity involved five or more

3  participants or was otherwise extensive, then I am to increase

4  the base offense level by three.

5        The Court finds that Mr. Rivera qualifies as a

6  manager or supervisor in this case clearly over an extended

7  period of time, and on the basis of the preponderance of the

8  evidence standard, the Court so finds.  Therefore, a

9  three-level aggravating role adjustment is made.  And that

10  means that the adjusted offense level is 33.  The defendant is,

11  in turn, entitled to a three-level downward adjustment for

12  acceptance --

13        MR. DONALDSON:  Excuse me, your Honor.  I

14  apologize.  You said the adjusted level would be 33.

15        THE COURT:  I misspoke.  It should be 31.  Thank

16  you, Mr. Donaldson.  Because we started at 28.  I stand

17  corrected.  We go from 28 to 31 for the adjustment in the role

18  in the offense and then back to 28 for a three-level downward

19  adjustment for acceptance of responsibility, and that's the

20  total offense level that the Court finds.

21        There is no criminal history, or at least no

22  recorded convictions, and therefore the defendant falls in

23  Criminal History Category I.  And that means that for the

24  purposes of the guideline at 28-1, it would be a 78 to 97-month

25  range for sentencing.

PDF created with pdfFactory trial version www.pdffactory.com

1              I will hear counsel.  I understand there are no

2    motions for a departure under the guidelines.  Is that correct,

3    Mr. Donaldson?

4              MR. DONALDSON:  Well, your Honor, I wasn't asking

5    for a departure.  I was asking for a variance.

6              THE COURT:  I understand.  We will get to that, but

7    I need to go through the steps.

8              And the government doesn't have anything with

9    respect to departure, correct?

10             MR. BLOOMER:  No.

11             THE COURT:  Now, Mr. Donaldson I'll hear you as to

12   why I should vary this sentence from the guideline sentence if

13   you wish to address that issue.

14             MR. DONALDSON:  Okay.  Your Honor, there are

15   several reasons why I'm asking the Court to vary the sentence

16   and take it out of the base offense level of 28.  The first

17   reason, your Honor, and I think that I can deal with this issue

18   quite succinctly, is the issue that as I pointed out in my

19   memorandum, there was some time in February of -- I want to say

20   2005 -- it was --

21             THE COURT:  The incident was in '04.  He was

22   arrested in October of '04.

23             MR. DONALDSON:  Right.  I want to make sure that --

24   2006, your Honor.  I have been in some discussions, basic,

25   rudimentary discussions with the government about Mr. Rivera

PDF created with pdfFactory trial version www.pdffactory.com

1    cooperating with the government with respect to opportunity for

2    a 5K1 departure.  And I advised him that I would get back to

3    him.  We did have a scheduled meeting for, I believe, sometime

4    around February 4th or sometime in that area.  But during that

5    period of time, I can't remember exactly, but there was a huge

6    snowstorm and there was a lot of things that had closed down.

7    Our schedules kind of conflicted, and then sometime in March of

8    2006 is when the police officers came to Mr. Rivera's house,

9    entered his house under the pretext that they had heard of some

10   complaints.

11            At that point in time, Mr. Rivera was at home alone

12   with his now 6-year-old child.  They took Mr. Rivera, separated

13   him from his 6-year-old child, took the 6-year-old child

14   upstairs into the bedroom by himself and I think either one or

15   two other agents.  And there was another three or four agents

16   that stayed downstairs with Mr. Rivera and continued to

17   question Mr. Rivera, can you buy drugs for us?  Can you get

18   drugs for us?  We want to get some drugs.  How soon can you get

19   some drugs for us?  And at all times he kept telling them that

20   he was on probation, he doesn't do that stuff, he's on house

21   confinement with the exception of going to work, if they have

22   any questions, they should be contacting his attorney.  He

23   called me incessantly the whole time that everything was going

24   on because he had his phone underneath the table, he kept

25   redialing my phone.

PDF created with pdfFactory trial version www.pdffactory.com

1          When I came out of my meeting I looked at all these

2     calls, I called him and asked him what was going on.  He told

3     me just what I just told you.  I called pretrial probation

4     services.  I questioned pretrial probation services.  The

5     probation officer was Chris Wylie at the time.  I asked him why

6     are you sending police officers out to my client?  And he says

7     he doesn't know anything about it.  So he said he would contact

8     the necessary people and get back with me and let me know.

9     Needless to say, the police officers at that point in time,

10    state, federal were not honest with him as well.

11          THE COURT:  They were not what?

12          MR. DONALDSON:  They were not honest with Mr. Wylie

13    as well.  They gave him no information.  At this point in time

14    the mother and father and the wife of Mr. Rivera came home

15    because that's where he was living.  Under the terms and

16    conditions of pretrial probation, he was to stay with his

17    parents.  They came home.  Everybody was scared at this point

18    in time.  Mr. Chris Wylie had no indication, couldn't tell us

19    whether or not these were police officers or whether they

20    weren't because as far as Mr. Wylie was concerned, they weren't

21    police officers because all of the authorities that he

22    contacted, including the Lowell Police Department, the State

23    Police barracks and all around, no one gave him any information

24    to ensure him that that was a police activity.  So at that

25    point in time Mr. Wylie made the decision in fear of the safety

PDF created with pdfFactory trial version www.pdffactory.com

1    of Mr. Rivera, his two children, his wife, his father and his

2    mother, removed them from the house and put them in a safe

3    hotel for over the weekend until we were able to conduct an

4    investigation that following Monday to determine what was

5    happening.

6              Needless to say, your Honor, that type of activity

7    is so outrageous that it would shock the conscience of any

8    court when a person like that is under probation, especially

9    the terms and conditions of probation where he's not to have

10   any contact with anybody.  Not only that, that they knew that

11   he was represented by counsel.  Notwithstanding those Sixth

12   Amendment, those basic issues, they came into his house and

13   violated his constitutional rights.

14             But there's another issue, your Honor.  Mr. Rivera

15   was involved in a very, very dirty business.  There's no --

16   that's why we're here, and that's why he's going to be punished

17   today.  But his family, his mother and father, they didn't sign

18   up for that.  He was not living with them when he was involved

19   in that business.  They signed up -- they signed up with the

20   Court to supervise him and to be responsible for him while he

21   was in custody or under pretrial release.  What the government

22   did was they intruded this house and basically scared the

23   living day lights out of him, scared for his children, for his

24   wife, his father and his mother to the point that Mr. Rivera

25   was chilled at that point in time whether he could even trust

PDF created with pdfFactory trial version www.pdffactory.com

1    the government, to whether he could even function under a 5K1

2    proffer because at this point in time no one was prepared to be

3    honest with him.

4           Your Honor, under those circumstances, I believe

5    that this is an atypical type of situation that would take this

6    case out of the heartland of normal cases and that he should be

7    able to be sentenced as if he was going to give a -- as if he

8    was going to cooperate with the government for purposes of a

9    5K1 departure.  I didn't ask for departure because technically

10   it's not a departure if he doesn't cooperate.  And then the

11   government would have to motion for that.  So there's no way

12   that we could do it.

13          So my suggestion, your Honor, would be -- I'm

14   requesting a variance based upon that, your Honor.  The reason

15   why I'm requesting a variance based upon that is because

16   constitutionally he was chilled from even being able to

17   participate in that process, to participate in sitting down

18   with the government, going with the government with respect to

19   how he obtained his drugs from Mr. Santiago, with respect to

20   how he sold his drugs, with respect to what he knew about

21   Mr. Santiago.  The government told me explicitly that if they

22   were going to give him anything, that he would have to testify

23   against Mr. Santiago.  That's the conversation that I had with

24   Mr. Rivera.  That's the first issue, your Honor.

25          The second issue, your Honor, is that I believe

PDF created with pdfFactory trial version www.pdffactory.com

1    that if your Honor would take a careful consideration and take

2    a look at Mr. Rivera's age, he's 28 years old.  At his

3    educational level.  He graduated from high school in Puerto

4    Rico.  He came to the United States with a license to perform

5    electric -- electricity duties and while he was here he got a

6    license to be a forklift driver.

7            Now, Mr. Rivera was doing electrical work and

8    forklifting duties at Kmart.  He got laid off and he was living

9    with his wife and his two children.  During that time, your

10   Honor, after he got laid off, he made the selfish decision to

11   go out and start selling drugs, more specifically poison in the

12   terrible drug of heroin, which is one of the most terrible

13   drugs that we all know of.  It's definitely in the top two,

14   three worst drugs that anybody can take.  He made that

15   self-decision.  He accepted that responsibility, your Honor.

16   He said that he was guilty.

17           I enlightened him on the issues with respect to

18   when police come into your house and all that.  He could have

19   done a lot of different things with respect to how when the

20   police came into the house illegally.  But he didn't.  He said

21   this is what happened, I'm going to tell you the truth from

22   this point forward, I'm going to be honest about everything, I

23   made the wrong decision, I caused a lot of pain with respect to

24   my children, they had to sacrifice, they didn't ask for this,

25   my wife didn't ask for it, my parents really didn't ask for it,

1    and I made these bad decisions and I'm going to stand up like a

2    man and I'm going to take responsibility for it.  So he's -- at

3    this point in time he's not making any lies, your Honor.  The

4    only thing he wants to do is he wants to pay for what he's done

5    and get his life straight again.

6            When I say "these things," your Honor, we take a

7    look at his record when he was out on pretrial probation.

8    Within six months while he was on pretrial probation, he was

9    allowed to have gainful employment, your Honor.  While he was

10   out on gainful employment, your Honor, he worked two jobs.

11   First job he was working -- he worked delivering glass

12   windshields for cars.  After that he started repairing auto

13   windshields.  And his bosses took enough respect and enough

14   trust in him that they gave him that opportunity to do that.

15   And they taught him how to do that and taught him how to even

16   open up his own business if he wanted to.

17           I would also suggest, your Honor, that not only did

18   he do that but he was given the responsibility to leave his

19   house at 7:00 in the morning and to get home before 6.  And he

20   had to drive all the way down to Quincy.  Sometimes -- and his

21   whole area was all of Massachusetts.  But no matter what, your

22   Honor, he would make sure that he did his job in a way that he

23   would get home not later than 6.  And if he was going to be

24   between 6 and 6:30, notwithstanding the rush hours on these

25   highways and everything, he would always call his probation

PDF created with pdfFactory trial version www.pdffactory.com

1    officer.  I'm sure your Honor saw the date of sentencing where

2    Probation Officer Wylie represented that Mr. Rivera -- let me

3    see if I have it here.  I moved my stuff around when the other

4    attorneys came on the other case.  I'd just like to read it for

5    the Court.  If I can have just one second, your Honor.

6            THE COURT:  Yes.

7            (Pause.)

8            MR. DONALDSON:  Okay, your Honor.  On October 16,

9    2006 authored by Christopher R. Reilly, he indicated that

10   Mr. Rivera has been in full compliance with his bail conditions

11   and checked with Massachusetts Criminal History Board there's

12   no new warrants, no new arrests while on his release.  And I'm

13   saying all these things, your Honor, is to say that he started

14   his part of rehabilitation before he -- while he was out on

15   pretrial probation before he said that he was guilty.  He

16   started his part of rehabilitation.  And I would suggest, your

17   Honor, that in looking at the U.S. sentencing Commission on

18   measuring recidivism, it clearly indicates that someone that is

19   in a -- between the ages of 26 and 30 years old with zero

20   criminal history points and has a very, very small chance to

21   get back in trouble, to get rearrested on issues.

22            And I would suggest, your Honor, that his is even

23   less than that because he already has licenses, he already has,

24   you know, a semi-career.  You know, he knows electricity.  He

25   now knows how to fix windows.  And he has indicated to me that

PDF created with pdfFactory trial version www.pdffactory.com

1    as soon as he gets placed into a facility, a jail, that he's

2    going to further his education on electricity and see if he can

3    get any other type of licensing and degrees that he can get

4    while he's in there.  So I would suggest, your Honor, that you

5    take that into consideration.

6            You also take into consideration, your Honor, the

7    fact that Mr. Rivera has a very, very strong family -- knit

8    family group.  His mother and his father have supported him a

9    hundred percent through this whole process.  His wife is still

10   here through this whole process.  Again, this happened back in

11   2004.  She's aware that, you know, he was involved with a

12   relationship with somebody else during that period of time when

13   they were selling drugs, but she is there for him and she's --

14   and they're still together as husband and wife.  And, you know,

15   he has that financial support as well as the emotional support

16   that he needs to be when he comes out to be a good, strong

17   citizen so that he can come out and work without having to

18   worry about getting in trouble.

19           I'm sure that his family -- and his father's

20   already indicated to me that, you know, he would do anything

21   that he can to make sure that when Rey does come out of jail,

22   that he is going to ask his boss to give him a job or at least

23   try to, you know, put him in touch with other individuals that

24   are in positions that can help him find gainful employment when

25   he gets out.

PDF created with pdfFactory trial version www.pdffactory.com

1            THE COURT:  Thank you, Mr. Donaldson.

2            Mr. Bloomer?

3            MR. BLOOMER:  I'm not sure where to begin, your

4    Honor.  I don't know if the Court wants to --

5            THE COURT:  What about this incident in February of

6    '06.  How does the government respond to that having an impact

7    on this sentencing?

8            MR. BLOOMER:  I have no idea how it has an impact

9    on the sentencing.  It's been my position all along that that

10   is irrelevant, it had no impact -- this is not the forum, this

11   is not the proceeding to address that.  Mr. Donaldson said that

12   we had basic rudimentary discussions about a possible plea

13   before this interest -- this incident.  That is generous to say

14   the least.  We talked on the phone a couple of times.  I made

15   it clear to Mr. Donaldson that it was the government's

16   position, number one, that he was not safety valve eligible

17   because he was a manager or a supervisor and, therefore,

18   anything he told us that he was not getting, in my view, a

19   safety valve departure.

20            Number two, yes, it would involve him having to

21   testify against Mr. Santiago because that's the only way he

22   could have gotten a departure.  However, we never got to the

23   point as to whether or not Mr. Rivera was going to testify

24   against Mr. Santiago.  As a matter of fact, the indications

25   were that he would not.  We had -- and after I received this --

PDF created with pdfFactory trial version www.pdffactory.com

1    I just want to say that I got this late, Judge.  The filings

2    weren't even given to me.  I had to go to the clerk's office to

3    get this.  After I got it, I went through my notes to determine

4    exactly what happened.  In January --

5                MR. DONALDSON:  I apologize, your Honor.  But this

6    is one issue.  I hand delivered this up to his office the same

7    day that I was down here.  So --

8                THE COURT:  That was no more than two days ago,

9    which was late to begin with, Mr. Donaldson.

10               MR. DONALDSON:  Yes.  Yes.

11               MR. BLOOMER:  I'm referring to the motion to

12    continue, your Honor, where it lays it out in the affidavit

13    exactly what he alleged happened.

14               THE COURT:  Okay.

15               MR. BLOOMER:  The end of January I spoke with

16    Mr. Donaldson.  We agreed to set up a meeting to determine

17    whether or not Mr. Rivera would come in for a meeting in early

18    September.  Mr. Donaldson didn't come for that meeting.  I'm

19    not sure what happened, but he didn't show up for the meeting.

20    I tried to call him on a number of different occasions, did not

21    get returned calls.  Time went by.  The end of March, my

22    understanding is I left the office for Friday.  I come in on

23    Monday, I got a call from Chris Wylie saying the police paid

24    Mr. Rivera a visit.  I called various police agencies, found

25    out that the Lowell police in fact responded to what I was told

1    were reports of unduly loud noise and neighbor complaints to

2    Mr. Rivera's parents' house.  And when they responded, they

3    were surprised to see Mr. Rivera there.  They thought that he

4    was held on pretrial detention.  So I reported that to the

5    Court.  I had no prior knowledge that that had occurred.  And I

6    reported to Mr. Wylie exactly what happened.

7            I have no idea how this affects the sentence.  I

8    really don't, Judge.  There was no indication, and this Court

9    knows, not one person in this case cooperated.  We had 12

10   defendants.  Out of 12 defendants zero cooperated and they

11   expressed fear of Mr. Santiago and retribution had they

12   testified.  All indications to me was that Mr. Rivera was not

13   going to testify.  He was not interested in that.  And, as a

14   matter of fact, the trial in this case started on October 15th

15   of 2006.  October 12th was the day that I was informed that

16   Mr. Rivera was going to plea and that there would be no plea

17   agreement, that he was just going to plea straight up.  I don't

18   understand how this visit from the police, even if it wasn't

19   proper, impacts sentencing.

20           I bring the Court back, Judge, to the facts of the

21   case and that this defendant was the primary -- and I say the

22   primary long-term customer of Mr. Santiago.  The investigation,

23   in fact, began in response to complaints of drug dealing

24   involving Mr. Rivera and Mr. Santiago.  That's how this whole

25   investigation began.  When they execute a search warrant at the

PDF created with pdfFactory trial version www.pdffactory.com

1    end of the investigation, 180 grams of heroin, a finger

2    press -- this Court remembers, I'm sure, the expert, Trooper

3    Shapiro, demonstrating how that finger press worked, that black

4    finger press in his residence, latex gloves, actually boxes of

5    fingers that had been precut were found, a digital scale,

6    $3,200 in cash.

7            Judge, this is a serious offense that demands, I

8    suggest, severe punishment.  Ninety-seven months I suggest to

9    this Court is reasonable.  Why do I say 97 months?  Because

10   when I looked at the GSR based upon what I thought was the

11   appropriate weight and I compared to what probation came up

12   with, 97 months overlapped.  In other words, for the base

13   offense level for 30 it was 97 to 121; for 28 it was 78 to 97.

14   And where he was found responsible for close to 700 grams of

15   heroin, I felt that 97 months was a fair and reasonable

16   sentence for this individual to serve given the severity of the

17   offense and his role in this offense.

18            And I would harken the Court to the sentences that

19   have been meted out today.  That 97 months I suggest is

20   perfect.  When we look at Santiago receiving 248 months; his

21   supplier, Juan Nunez, getting 151 months; another major

22   customer, Carlos Sanchez, getting 127 months; a career offender

23   getting 264 months.  And then you have the lower level players

24   such as Zuleima Reyes getting 36 months; Torrez 36 months;

25   Pedro Miranda 72 months.  The 97 months here for Mr. Rivera is

PDF created with pdfFactory trial version www.pdffactory.com

 1  a fair and it is a reasonable sentence and it was one that will

 2  promote respect for the law and it was one that will protect

 3  the public from this defendant.

 4          THE COURT:  All right, thank you.

 5          First, I am not going to enter a variant sentence

 6  in this case.  I do not see any grounds for an

 7  outside-the-guidelines sentence.  If the incident that occurred

 8  in February '06 was as described by Mr. Donaldson, then perhaps

 9  the parents or anyone else who was present that has a claim

10  against the Lowell Police Department under Section 1983, but to

11  me it does not impact this sentence in any way.  The Court

12  will, therefore, sentence within the guidelines.  I've already

13  heard the government's recommendation for sentencing within the

14  guidelines.  I'll hear Mr. Donaldson briefly if he wishes to

15  address the Court.

16          MR. DONALDSON:  Your Honor, if your Honor would

17  sentence him within reference to the advisory guidelines.

18  Again I would ask your Honor to take into consideration the

19  3553(a) considerations, your Honor, with respect to

20  Mr. Rivera's -- his overall issues with respect to him as a

21  person, your Honor.

22          But if we're just basically talking about the basic

23  advisory guideline sentence, I would suggest, your Honor, that

24  he be sentenced to the low range of the guidelines.  And I

25  believe that the low range is 78 months.  And I would ask for

PDF created with pdfFactory trial version www.pdffactory.com

1    that to be also consistent with the similarly situated other

2    defendants, your Honor.

3              I would also indicate that Mr. Torrado, who is also

4    considered to be one of the larger scale but on the same level

5    as Mr. Rivera, I believe that he got a five-year sentence.

6    That was by a plea agreement, your Honor.  But the other

7    individual, he got a 72-month sentence.  So I would suggest,

8    your Honor, that he would be -- that he would be given a

9    72-month sentence if your Honor was to go below -- if your

10   Honor was to go below, but to give a 78 if you weren't willing

11   to go below the sentence, your Honor.  I would also ask that he

12   be given an opportunity to have credit for the drug program as

13   well.

14             THE COURT:  All right.  Does the defendant wish to

15   address the Court before sentence is imposed?

16             MR. DONALDSON:  He had indicated to me, your Honor,

17   that he would like to address the Court.  His father and his

18   wife also indicated that they would like to address the Court.

19             THE COURT:  Well, I'm not going to hear from the

20   father and the wife.  I will hear from the defendant.

21             THE DEFENDANT:  I'd like to apologize to the

22   government, the United States, and to society at large for the

23   harm that I committed.  I apologize to my family for the bad

24   times that I had them go through due to this situation, to ask

25   you, your Honor, that my punishment would be as lenient as

PDF created with pdfFactory trial version www.pdffactory.com

1    possible, not for me but for my children and my family, who we

2    all need each other.  That will be all.  Thank you.

3            THE COURT:  Do counsel have any reason why sentence

4    ought not to be imposed at this time?

5            MR. BLOOMER:  No, your Honor.

6            MR. DONALDSON:  Not at this time, your Honor.

7            THE COURT:  All right.  The government in its brief

8    made a recommendation for a fine, Mr. Bloomer.  Is there any

9    evidence that the defendant has the ability to pay a fine?

10           MR. BLOOMER:  I leave that to the Court's

11   discretion, your Honor.  At the time I wrote the sentencing

12   memo, I'm sure I looked at the PSR in arriving at that.

13           THE COURT:  Well, I don't see a net worth that

14   warrants it, Mr. Bloomer, unless you know something I don't.

15           MR. BLOOMER:  No, your Honor.  No.

16           THE COURT:  All right.  Please stand, Mr. Rivera.

17           It is never a pleasure to sentence anybody to

18   incarceration, but the crime you committed deserves a severe

19   punishment.  There will be people who will suffer other than

20   you as a result of this sentence, but the person that you

21   should blame for that is the one you see in the mirror, not

22   anyone else.  Because any hardship that is caused to your

23   family, your parents, your children, your wife has been caused

24   by you, not by society, not by this Court, not by the

25   government, not by anyone else but you.  The spreading of

PDF created with pdfFactory trial version www.pdffactory.com

1    heroin in the Lowell and Fitchburg area is just as bad as if

2    you had distributed poison to those people.  Young people who

3    become addicts have no choice in the matter.  You make them

4    dependent on this drug.  You and anyone else that participate

5    in conspiracies to distribute this drug deserve to get thrown

6    in jail for a long period of time.

7                The only reason why I am going to not go to the

8    high end of the guideline is because I think you have shown an

9    ability when you apply yourself to be a decent human being and

10   to conduct yourself in a way that could be productive.  You

11   apparently have had a good employment record for most of the

12   last 10 or 12 years.  How you got involved in this or why you

13   got involved is totally unclear and unexcusable.  But this is

14   the last clear chance you have.  You're going to go to jail for

15   a long period of time, but you'll still be a young man when you

16   get out.  You'll still have the opportunity to participate in

17   the society and do something good for your family and for the

18   people around you, but you're going to have a long time to

19   think about it.  If you ever are in this court again on a

20   similar charge, you will go to jail for the rest of your life.

21   I hope you understand that.

22                Pursuant to the Sentencing Reform Act of 1984 and

23   having considered the sentencing factors enumerated in Title 18

24   of the United States Code Section 3553(a), it is the judgment

25   of this Court that you, Reynaldo Rivera, are hereby committed

PDF created with pdfFactory trial version www.pdffactory.com

1   to the custody of the Bureau of Prisons to be imprisoned for a

2   term of 88 months.  This term consists of terms of 88 months on

3   each count to be served concurrently.  The Court makes a

4   judicial recommendation that you participate in the Bureau of

5   Prisons' 500-hour residential drug abuse program.

6         Upon release from imprisonment, you shall be placed

7   on supervised release for a term of four years.  This term

8   consists of terms of four years on each count, all such terms

9   to run concurrently.  Within 72 hours of release from custody

10  of the Bureau of Prisons, you shall report in person to the

11  district to which you are released.

12        No fine is imposed based upon this Court's finding

13  that you are unable to pay a fine and are unlikely to become

14  able to pay a fine.

15        While on supervised release, you shall comply with

16  the following terms and conditions:  First, you shall not

17  commit another federal, state or local crime and shall not

18  illegally possess a controlled substance.  Second, you shall

19  refrain from any unlawful use of a controlled substance and

20  submit to one drug test within 15 days of release from

21  imprisonment and at least two periodic drug tests thereafter,

22  not to exceed 50 tests per year as directed by the probation

23  office.  Third, you are to submit to the collection of a DNA

24  sample as directed by the probation office.  Fourth, you shall

25  comply with the standard conditions that have been adopted by

PDF created with pdfFactory trial version www.pdffactory.com

1   this Court and are described in the Sentencing Guidelines at

2   Section 5D1.3(c) and will be set forth in detail in the

3   judgment and committal.

4         You are prohibited from possessing a firearm,

5   destructive device or other dangerous weapon.  You are not to

6   consume any alcoholic beverages.  You are to participate in a

7   program for substance abuse counseling as directed by the

8   United States probation office, which program may include

9   testing, not to exceed 50 tests per year, to determine whether

10   you have reverted to the use of alcohol or drugs.  You shall be

11   required to contribute to the cost of services for such

12   treatment based upon your ability to pay or the availability of

13   third-party payment.

14         It is further ordered that you shall pay to the

15   United States a special assessment of $600, which shall be due

16   and payable immediately.

17         Mr. Rivera, you have a right to appeal this

18   sentence.  If you choose to appeal, you must do so within ten

19   days.  If you cannot afford an attorney, an attorney will be

20   appointed on your behalf.

21         Do you understand that?

22         THE DEFENDANT:  Yes.

23         THE COURT:  Is there any further business to come

24   before the Court?  Mr. Bloomer.

25         MR. BLOOMER:  Four years supervised release, your

PDF created with pdfFactory trial version www.pdffactory.com

1   Honor?

2          THE COURT:  Did I not say that?

3          MR. DONALDSON:  That's what I heard.

4          THE COURT:  I did say that, I believe.  Four years

5   supervised release.

6          MR. BLOOMER:  Nothing further, your Honor.

7          MR. DONALDSON:  Your Honor, I have something.

8          THE COURT:  Yes, Mr. Donaldson.

9          MR. DONALDSON:  As part and parcel of Mr. Rivera's

10  pretrial release, his family put their house up.  Do you

11  want -- should I by motion request that the lien on the

12  property be released?

13         THE COURT:  Yes, that is done by motion.  And the

14  motion when it is properly filed will be allowed.

15         MR. DONALDSON:  Thank you, your Honor.

16         THE CLERK:  The defendant is remanded to custody of

17  the U.S. Marshal.  All rise.

18         (Adjourned, 4:49 p.m.)

19              - - - - - - -

20            CERTIFICATION

21         I certify that the foregoing is a correct

22  transcript of the record of proceedings in the above-entitled

23  matter to the best of my skill ability.

24  /s/ Shelly M. Killian
     Shelly M. Killian RPR, CM, CRR

25  Registered Professional Reporter
     May 24, 2008

PDF created with pdfFactory trial version www.pdffactory.com